IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| BRANDON ALEXANDER TEELE MOORE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:18CV193 |
| ANDREW SAUL, Commissioner of Social Security, [1] | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Brandon Alexander Teele Moore ("Plaintiff") brought this action pursuant to

Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C.

§§ 405(g), 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of

Social Security denying his claims for Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI") under Titles II and XVI of the Act. The parties have filed cross-

motions for judgment, and the administrative record has been certified to the Court for review.

## I.    PROCEDURAL HISTORY

Plaintiff protectively filed applications for DIB and SSI on November 25, 2013, alleging

a disability onset date of April 1, 2013. (Tr. at 18, 280-85, 286-95.)[2] His applications were

---

[1] Andrew Saul became Commissioner of Social Security on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew Saul should be substituted for Nancy A. Berryhill as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #12].

denied initially (Tr. at 106-27, 168-72) and upon reconsideration (Tr. at 128-67, 180-99). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 200-03.) On June 26, 2017, Plaintiff, along with his attorney and an impartial vocational expert ("VE"), attended the subsequent hearing. (Tr. at 76-105.) The ALJ ultimately concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 15-35), and, on January 12, 2018, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 3-8, 279).

II.    LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270

F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since his alleged onset date. The ALJ therefore concluded that Plaintiff met his burden at step one of the sequential evaluation process. (Tr. at 20.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> Ehlers-Danlos syndrome - hypermobility type (EDS); anxiety disorder; peripheral neuropathy; obesity.

(Id.)[5] The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 21-23.) Therefore, the ALJ assessed

---

[5] "Hypermobile Ehlers Danlos Syndrome ('hEDS') is 'an inherited connective tissue disorder that is caused by defects in a protein called collagen. It is generally considered the least severe form of Ehlers–Danlos syndrome (EDS) although significant complications can occur.' National Center for Advancing Translational Sciences, Hypermobile Ehlers–Danlos syndrome: Summary, Genetic and Rare Diseases Information Center (last updated Apr. 20, 2017), https://rarediseases.info.nih.gov/diseases/2081/ehlers-danlos-syndrome-hypermobility-type. The symptoms often include 'joint hypermobility, affecting both large (elbows, knees) and small (fingers, toes) joints; soft, smooth skin that may be slightly elastic (stretchy and bruises easily); and chronic musculoskeletal

Plaintiff's RFC and determined that he could perform sedentary work with further limitations.

Specifically, the ALJ found that Plaintiff:

> Has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant must use a cane for ambulation; he can frequently handle and finger items with the bilateral upper extremities; he can frequently climb ramps and stairs; he can never climb ladders, ropes, or scaffolds; he can occasionally balance, stoop, kneel, crouch, and crawl; [he] can never work at unprotected height; he is limited to the performance of simple, routine, repetitive tasks; he is limited to simple work-related decisions; and while he can never interact with the public, he can occasionally interact with coworkers and supervisors.

(Tr. at 23.) Under step four of the analysis, the ALJ determined that Plaintiff did not have any past relevant work. (Tr. at 32.) However, the ALJ concluded at step five that, given Plaintiff's age, education, work experience, and RFC, along with the testimony of the VE regarding those factors, Plaintiff could perform other jobs available in the national economy and therefore was not disabled. (Tr. at 33-34.)

Plaintiff now raises four challenges to the ALJ's decision. First, Plaintiff argues that "[t]he ALJ performed an improper listing analysis" (Pl.'s Br. [Doc. #15] at 5) in finding that Plaintiff did not meet Listing 11.14. Second, Plaintiff contends that "[t]he ALJ improperly evaluated [Plaintiff's] credibility." (Id. at 10.) Third, Plaintiff asserts that "[t]he ALJ's assigned RFC is not supported by substantial evidence and the analysis frustrates meaningful review." (Id. at 13.) Fourth, Plaintiff maintains that "[t]he ALJ did not adequately explain weight given to medical opinions." (Id. at 15.) After a careful review of the record, the Court finds no basis for remand.

---

(muscles and bones) pain[,]' among less frequent others. Id." Parsons v. Berryhill, No. 2:16CV743, 2018 WL 1515089, at *11 (E.D. Va. Jan. 22, 2018) (footnote omitted).

A.     Listing 11.14

Plaintiff first contends that "the ALJ . . . conducted an improper listing analysis in finding that [Plaintiff] did not meet [L]isting 11.14" (Peripheral Neuropathy). (Id. at 5.)  In particular, Plaintiff asserts that his EDS meets the requirements of paragraph B of Listing 11.14, in that it causes him to suffer "marked limitation in physical functioning" (id. at 6) and "marked restrictions in interacting with others and concentration, persistence or pace" (id. at 7).  According to Plaintiff, the ALJ's analysis regarding Listing 11.14 "frustrates meaningful review" by this Court, because it "is conclusory," "does not cite to any evidence in the record," and "only addresses the [paragraph] A criteria" of Listing 11.14.  Plaintiff's contentions do not warrant relief.

At step three of the sequential analysis, the ALJ considers whether any impairment meets or equals one or more of the impairments listed in Appendix 1 of the regulations.  The listings define impairments which are so severe that they would "prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just 'substantial gainful activity.'"  Sullivan v. Zebley, 493 U.S. 521, 532 (1990).  For a claimant to demonstrate that he qualifies for a listing, and therefore is entitled to a conclusive presumption of disabled status, he must meet all of the medical criteria specified for that listing.  Id. at 531.  An impairment that meets only some of the listing criteria, no matter how severe, will not qualify.  Id.  Similarly, "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to all the criteria for the one most similar listed impairment."  Id. (emphasis in original).

Notably, at step three, an ALJ is not required to explicitly identify and discuss every possible listing; however, he is compelled to provide a coherent basis for his step three determination, particularly where the "medical record includes a fair amount of evidence" that a claimant's impairment meets a disability listing. Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013). Where such evidence exists but is rejected without discussion, "insufficient legal analysis makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings." Id. (citing Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986)). Thus, the ALJ's decision must include "a sufficient discussion of the evidence and explanation of its reasoning such that meaningful judicial review is possible." Meador v. Colvin, No. 7:13–CV–214, 2015 WL 1477894, at *3 (W.D. Va. Mar. 27, 2015) (citing Smith v. Astrue, 457 F. App'x 326, 328 (4th Cir. 2011)). However, it is possible that even "[a] cursory explanation" at step three may prove "satisfactory so long as the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence to support the conclusion." Id.

In order to meet Listing 11.14B, a claimant must demonstrate:

B.  Marked limitation in physical functioning, and in one of the following:

    1.    Understanding, remembering, or applying information; or

    2.    Interacting with others; or

    3.    Concentrating, persisting, or maintaining pace; or

    4.    Adapting or managing oneself.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 11.14B (emphasis added) (internal citations omitted). In turn, with respect to physical functioning, "a marked limitation means that, due to the signs

and symptoms of [the] neurological disorder, [a claimant is] <u>seriously limited</u> in the ability to independently initiate, sustain, and complete work-related physical activities . . . such as standing, balancing, walking, [and] using both upper extremities for fine and gross movements." <u>Id.</u>, § 11.00G2a (emphasis added).

Plaintiff contends that the ALJ did not, in the step three analysis itself, discuss the paragraph B criteria or provide any evidence to support her finding that Plaintiff's peripheral neuropathy did not meet or equal Listing 11.14. (<u>See</u> Tr. at 21.) However, the ALJ's discussion and analysis at Step 3 and in other parts of her decision provide substantial evidence supporting the ALJ's finding regarding Listing 11.14. <u>See</u> <u>Meador,</u> 2015 WL 1477894, at *3 (recognizing that even "[a] cursory explanation" at step three may prove "satisfactory so long as the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence to support the conclusion.").

Here, with respect to Listing 11.14's requirement that Plaintiff demonstrate <u>marked</u> limitation in either "1. Understanding, remembering, or applying information; or 2. Interacting with others; or 3. Concentrating, persisting, or maintaining pace; or 4. Adapting or managing oneself," Plaintiff contends that he has marked limitation in Interacting with others and Concentrating, persisting, or maintaining pace ("CPP"). However, as part of his discussion at Step 3, the ALJ did consider Plaintiff's ability to interact with others and maintain CPP in connection with the ALJ's assessment whether Plaintiff's anxiety disorder met or equaled Listings 12.06 (Anxiety and Obsessive-Compulsive Disorders) and 12.07 (Somatic Symptom and Related Disorders). (<u>See</u> Tr. at 22.) The ALJ provided the following analysis regarding Plaintiff's ability to interact with others:

> In interacting with others, [Plaintiff] has <u>moderate</u> limitation. Many medical records indicate that [Plaintiff] became frustrated easily and got angry and yelled at his physicians. During a consultative examination in June 2015, [Plaintiff] was mildly oppositional, especially when he believed the examiner to be questioning him. He reported that he had a fiancé who lived in Missouri, whom he spoke with often, but otherwise, he had no friends and typically just interacted with his family. He noted that he had some problems regulating his anger, and that his temper would flare.

(<u>Id.</u> (emphasis added).) Although Plaintiff detailed evidence tending to show that Plaintiff, at times, exhibited a sarcastic tone, poor eye contact, perceptive rigidity, feelings of anger and resentment, and agitation (<u>see</u> Pl.'s Br. at 7-9 (citing Tr. at 54, 507, 511, 658, 662, 730, 747)), the ALJ, as detailed above, clearly acknowledged Plaintiff's anger issues, and Plaintiff cites to no evidence that would have compelled the ALJ to adopt a marked limitation in this area of mental functioning. With respect to Plaintiff's ability to maintain CPP, the ALJ reasoned as follows:

> With regard to [CPP], [Plaintiff] has <u>mild</u> limitation. In June 2015, it was assessed that [Plaintiff] was able to maintain concentration and persistence. During a consultative examination in October 2015, it was noted that his attention, concentration, and memory were all within normal limits.

(Tr. at 22 (emphasis added) (internal citation omitted); <u>see also</u> Tr. at 820, 865.) Thus, the ALJ cited to substantial evidence to support her mild finding and, notably, Plaintiff cites to no evidence demonstrating any limitations in CPP, let alone evidence requiring a marked deficit in CPP.

Similarly, with respect to Listing 11.14's requirement that Plaintiff demonstrate <u>marked</u> limitation physical functioning, i.e., <u>seriously limitation</u> in the ability to independently initiate, sustain, and complete work-related physical activities, the ALJ made the following findings at Step 3 in considering whether Plaintiff's musculoskeletal complaints met listing 1.02 or 1.04:

A review of the evidence of record fails to indicate the claimant's condition resulted in an inability to ambulate effectively as defined by Social Security Regulations. Treatment notes fail to document an extreme limitation in the claimant's ability to walk (i.e., impairment(s) that interfere very seriously with the individual's ability to independently initiate, sustain or complete activities) or as having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive devise that limits the functioning of both upper extremities. The evidence indicates that the claimant is capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living and has the ability to travel without companion assistance to and from a place of employment. Further claimant's condition has not resulted in an inability to perform fine and gross movements effectively, as required.

(Tr. at 21.) Based on this analysis, there was no basis for finding a marked limitation in physical functioning. In addition, the ALJ discussed the following relevant evidence in her evaluation of Plaintiff's RFC:

- At a consultative medical examination in April 2014, Plaintiff "was able to ambulate without difficulties and without any assistive devices" or "knee braces," displayed "full range of motion and normal gait,' and could "tandem, heel, and toe walk and squat without any difficulties" (Tr. at 26; see also Tr. at 527, 530);

- In July 2014, Plaintiff "did not have any objective findings of a neuropathy" (Tr. at 27; see also Tr. at 599);

- In February 2015, a physical examination "was essentially normal" (Tr. at 27; see also Tr. at 686 (reflecting 5/5 strength, normal sensation, and normal gait without an assistive device));

- In April 2015, Plaintiff "had normal and equal strength in his bilateral lower extremities with no objective sensory deficits" (Tr. at 28; see also Tr. at 814);

- In June 2015, Plaintiff "had a normal straight leg raise, . . . his distal ankle and foot strength was normal[,] . . . [and h]e walked with a normal gait" (Tr. at 28; see also Tr. at 849);

- In October 2015, a psychiatrist noted that Plaintiff "removed his knee braces during an examination and freely walked around the room" (Tr. at 29; see also Tr. at 865);

- In October 2016, despite Plaintiff's complaints of left arm numbness, "MRIs of his cervical and thoracic spine were unremarkable, as were EMG nerve conduction studies" (Tr. at 29; see also Tr. at 964, 1005-06); and

- Although Plaintiff presented to the hearing with a cane, "there was no support for the use of a cane in the medical evidence of record which reflect[s] unremarkable physical exams, including 5/5 strength and normal gait" (Tr. at 31; see also Tr. at 88).

The ALJ also noted the opinion of Dr. Joseph Wilson in December 2013 that Plaintiff required only limitations on significant climbing, walking, or kneeling (Tr. at 31; see also Tr. at 494) and the opinion of consultative examiner Dr. Micah Edwin in April 2014 that Plaintiff "did not need an assistive device for ambulation, and that his ability to sit, stand, move about, lift, carry, handle objects, . . . and stamina w[ere] not impaired." (Tr. at 31 (emphasis added); see also Tr. at 530.) Considered as a whole, the ALJ's discussion and analysis amounts to substantial evidence that Plaintiff's peripheral neuropathy did not result in marked limitation in physical functioning.

Plaintiff points to evidence that various treatment providers have diagnosed him with EDS, chronic pain, numbness and tingling, and knee instability. (Pl.'s Br. at 6-7 (citing Tr. at 849, 877-78, 1102).) However, the diagnosis of a condition does not equate to functional limitations arising from those diagnoses. See McCoy v. Astrue, Civ. No. 1:10-3139-RBH-SVH, 2012 WL 1015785, at *22 (D.S.C. Feb. 10, 2012) ("[The p]laintiff continues to confuse objective findings of her diagnoses with objective findings supporting her alleged functional limitations."). Plaintiff also relies on a functional capacity evaluation ("FCE") conducted in

November 2013, which concluded that Plaintiff "cannot comfortably squat[] below his knuckle level," his "[s]tanding endurance is limited to approximately 17 minutes longest duration, [his] walking endurance is limited to approximately 10 minutes longest duration," and his "upper extremity strength and dexterity is below average." (Pl.'s Br. at 7 (quoting Tr. at 479).) However, ALJ assigned only partial weight to the FCE (see Tr. at 31) and gave greater weight to more recent examinations and evaluations.[6]

Accordingly, Plaintiff has not demonstrated prejudicial error with respect to the ALJ's finding that Plaintiff's peripheral neuropathy did not meet or equal Listing 11.14.[7]

B.    Plaintiff's Subjective Symptoms

Next, Plaintiff contends that "the ALJ's credibility analysis is not supported by substantial evidence." (Pl.'s Br. at 11 (emphasis added) (citing Tr. at 24-31).)[8]    More

---

[6] Moreover, that FCE would not support a finding of a marked limitation in physical functioning to meet Listing 11.14 in any event. (See Tr. at 479-92.)

[7] The Court also notes that the ALJ referenced an earlier version of Listing 11.14 in her listing evaluation. The ALJ remarked that she "d[id] not find that [Plaintiff's] neuropathy-type symptoms me[t] or medically equal[ed] the requirements of Listing 11.14 [because] [h]is condition ha[d] not resulted in significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." (Tr. at 21.)    The ALJ's reference to "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station" tracks the language of Listing 11.14 as it existed until May 23, 2016. See 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 11.14 (version effective from August 12, 2015, to May 23, 2016). As of May 24, 2016, however, Listing 11.14 took on its current form, requiring in Paragraph A "[d]isorganization of motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities" (internal citations omitted). See id. (version effective May 24, 2016.) Nevertheless, given the analysis set out above, that error by the ALJ remains harmless under the circumstances of this case.

[8] Contrary to Plaintiff's allegations, the ALJ was not under an obligation to assess the credibility of Plaintiff's statements. Effective March 28, 2016, the Social Security Administration superseded Social Security Ruling 96–7p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 1996 WL 374186 (July 2, 1996) ("SSR96-7p"), with Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304 (Oct. 25, 2017). The new ruling "eliminat[es] the use of the term 'credibility' from . . . sub-regulatory policy, as [the] regulations do not use th[at] term." SSR 16-3p, 2017 WL 5180304, at *2. The ruling "clarif[ies] that subjective symptom evaluation is not an examination of the individual's character," id., and "offer[s] additional guidance

13

specifically, Plaintiff challenges the ALJ's finding that, although Plaintiff "'had several complaints associated with EDS, . . . there was no support in the objective medical evidence, as several tests and examinations for various medical conditions showed negative results.'" (Id. (quoting Tr. at 30-31).)   According to Plaintiff, "the medical evidence shows several opinions in support of an EDS-HT diagnosis, and such diagnosis was made by geneticist Dr. [Tamison] Jewett on June 7, 2016, after an extensive evaluation."  (Id. (citing Tr. at 877).) Plaintiff additionally questions the ALJ's reliance on Exhibits 22F and 24F as "'reflect[ing] unremarkable physical exams, including 5/5 strength and normal gait'" and cites other record evidence he believes supports his subjective complaints.  (Id. at 12 (citing Tr. at 461, 858, 849, 882, 899).)  Lastly, Plaintiff notes Dr. Samantha H. Moore's statement that "some of the [EDS] community finds physicians to falsely accuse them of hypochondriasis and underestimate the true severity of their sufferings," contending that Dr. Moore's "opinion shows that [Plaintiff's] complaints may have, at times, been unfairly brushed aside due to the lack of expertise in the diagnosis of EDS-HT."  (Id. at 13 (emphasis added) (quoting Tr. at 860).)[9]

Under the applicable regulations, the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms."  Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *10 (Oct. 25, 2017) ("SSR 16-3p"); see also 20 C.F.R. §§ 404.1529, 416.929.  In Craig v. Chater, the Fourth

---

to [ALJs] on regulatory implementation problems that have been identified since [the publishing of] SSR 96–7p," id. at *2 n.1

[9] Plaintiff mistakenly attributed this statement to Dr. Mark D. Gwynne.  (See Pl.'s Br. at 13.)

Circuit addressed the two-part test for evaluating a claimant's statements about symptoms. Craig, 76 F.3d at 594-95. "First, there must be objective medical evidence showing 'the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged.'" Id. at 594 (citing 20 C.F.R. § 404.1529(b)). If the ALJ determines that such an impairment exists, the second part of the test then requires him to consider all available evidence, including Plaintiff's statements about his pain, in order to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [his] ability to work." Craig, 76 F.3d at 595.

This approach facilitates the ALJ's ultimate goal, which is to accurately determine the extent to which Plaintiff's pain or other symptoms limit his ability to perform basic work activities. Relevant evidence for this inquiry includes Plaintiff's "medical history, medical signs, and laboratory findings," Craig, 76 F.3d at 595, as well as the following factors:

(i) [Plaintiff's] daily activities;

(ii) The location, duration, frequency, and intensity of [Plaintiff's] pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or [has] taken to alleviate [his] pain or other symptoms;

(v) Treatment, other than medication, [Plaintiff] receive[s] or [has] received for relief of [his] pain or other symptoms;

(vi) Any measures [Plaintiff] use[s] or [has] used to relieve [her] pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning [Plaintiff's] functional limitations and restrictions

due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.919(c)(3). At step two, the ALJ should not reject a claimant's statements "about the intensity and persistence of [his] pain or other symptoms or about the effect [his] symptoms have on [his] ability to work solely because the available objective medical evidence does not substantiate [his] statements." 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). However, a claimant's "symptoms, including pain, will be determined to diminish [his] capacity for basic work activities [only] to the extent that [his] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Thus, objective medical evidence. and other evidence in the record are "crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs [his] ability to work." Hines, 453 F.3d at 565 n.3 (quoting Craig, 76 F.3d at 595). Where the ALJ has considered these factors and has heard Plaintiff's testimony and observed his demeanor, the ALJ's determination is entitled to deference. See Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to produce some of the above alleged symptoms" but that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record" and that "[t]reatment notes simply fail to indicate the level of dysfunction the claimant is alleging." (Tr. at 24.) The ALJ further noted that Plaintiff's "statements have been found to affect [Plaintiff's] ability to work only to the extent they can reasonably be accepted as consistent with the

objective medical and other evidence." (Id.) The ALJ did not err in that regard and supported her analysis of Plaintiff's subjective symptoms with substantial evidence.

Plaintiff first misinterprets the ALJ's statement that, although Plaintiff "'had several complaints associated with EDS, . . . there was no support in the objective medical evidence, as several tests and examinations for various medical conditions showed negative results'" to mean that the ALJ found "no support in the objective medical evidence" for Plaintiff's EDS diagnosis. (Pl's Br. at 11 (quoting Tr. at 30-31).) However, the ALJ's decision makes clear that she credited Plaintiff's EDS diagnosis, as the ALJ included EDS among Plaintiff's severe impairments at step two. (See Tr. at 20.) Instead, the ALJ found that "there was no support in the objective medical evidence" for "several" of Plaintiff's "complaints associated with EDS." (Tr. at 30 (emphasis added).) In other words, the ALJ was capturing observations made earlier in her decision that, despite Plaintiff's complaints of knee pain, back pain, shoulder pain, and numbness and tingling in his extremities, objective findings on examination and diagnostic and laboratory tests were consistently negative. (See Tr. at 24-30.)

Plaintiff's challenge to the ALJ's observation that the medical evidence "'reflect[ed] unremarkable physical exams, including 5/5 strength and normal gait'" fares no better. (Pl.'s Br. at 12 (quoting Tr. at 31).) In that regard, Plaintiff claims that "Exhibit 22F shows after an extensive evaluation, Dr. [Jonathan S.] Berg recommended that [Plaintiff] continue physical therapy, continue follow-up with podiatry and orthopedics for management of orthotic devices, refer to the Joint Hypermobility Handbook, and follow-up with neurology for continued evaluation of lower extremity paresthesias" (id. (citing Tr. 858) (internal quotation marks omitted)), and that "Exhibit 24F shows Dr. [Thomas C.] Keyserling stated [Plaintiff's]

EDS-HT diagnosis by Dr. Jewett is consistent with his history and physical exam" (id. (citing Tr. at 899) (internal quotation marks omitted)). Plaintiff additionally points to the FCE's finding of antalgic symptoms, as well as findings of knee instability, numbness and tingling in both legs, bilateral chronic knee pain, and generalized discomfort recorded by other treatment providers as evidence that his "complaints are credible." (Id. (citing Tr. at 461, 849, 882).)

Beyond the FCE's one-time finding of antalgia, Plaintiff fails to explain how any of the evidence she relies upon above undercuts the ALJ's observation that the medical evidence "reflect[ed] unremarkable physical exams, including 5/5 strength and normal gait" (Tr. at 31). Moreover, Plaintiff's argument misinterprets this Court's standard of review. The Court must determine whether substantial evidence supports the ALJ's finding regarding the consistency of Plaintiff's subjective symptoms with the record, and not whether other record evidence weighs against the ALJ's analysis. See Lanier v. Colvin, No. CV414-002, 2015 WL 3622619, at *1 (S.D. Ga. June 9, 2015) ("The fact that [the p]laintiff disagrees with the ALJ's decision, or that there is other evidence in the record that weighs against the ALJ's decision, does not mean that the decision is unsupported by substantial evidence."). As detailed in conjunction with Plaintiff's first issue on review, the ALJ's discussion of the medical evidence provides an abundance of evidence supporting her finding that Plaintiff's statements were "not entirely consistent with the medical evidence and other evidence in the record." (Tr. at 24.)

Finally, Plaintiff's reliance on Dr. Moore's observation that "some of the [EDS] community finds physicians to falsely accuse them of hypochondriasis and underestimate the true severity of their sufferings" to suggest that Plaintiff's EDS symptoms "may have, at times, been unfairly brushed aside" falls short. (Pl.'s Br. at 13 (emphasis added) (quoting Tr. at 860).)

Plaintiff fails to cite to a single instance in the voluminous record where his EDS complaints were "unfairly brushed aside." Indeed, the record reflects that Plaintiff's treatment providers ordered numerous different laboratory and diagnostic tests and prescribed various medications and treatment modalities in an attempt to help Plaintiff identify the cause(s) of his symptoms, alleviate his pain and other symptoms, and restore his functionality, many of which Plaintiff refused to undergo (see, e.g., Tr. at 535 (regular activity, healthy body mass index, swimming, physical therapy), 667 (counseling), 695 (weight loss), 727 (anti-depressant medication), 739 (aqua therapy), 857 (physical therapy, long-term coping mechanisms), 861 (anti-depressant medication, sleep study, pain clinic, online educational course), 878 (physical therapy, Epsom salt baths, nutritional supplements, psychotherapy, physical activity), 959 (anti-depressant medication), 964 (weight loss, generalized muscular conditioning), 1112 (psychiatric evaluation).) In sum, Plaintiff's second assignment of error fails to warrant relief.

C.     RFC

In her third issue on review, Plaintiff argues that "[t]he ALJ's assigned RFC is not supported by substantial evidence and the analysis frustrates meaningful review." (Pl.'s Br. at 13.) In particular, Plaintiff maintains that "the ALJ failed to include additional limitations for standing or walking, which are necessary due to his impairments as a result of his EDS-HT, as indicated by the [FCE]" and "additional limitations as to [interaction with] coworkers and supervisors" based on consultative psychological examiner Dr. Jill R. Grant's opinion. (Id. at 13-14 (citing Tr. at 31, 479, 662).) With regard to standing or walking, Plaintiff relies on the FCE's findings that Plaintiff's "standing endurance is limited to approximately 17 minutes longest duration" and his "walking endurance is limited to approximately 10 minutes longest

duration." (Pl.'s Br. at 14 (citing Tr. at 479).) Plaintiff points out that sedentary work requires occasional walking and standing, which means from very little up to two hours in an eight-hour workday (id. (citing 20 C.F.R. § 404.1567(a), and Social Security Ruling 96-9p, Policy Interpretation Ruling Titles II and XVI: Determining Capability to Do Other Work – Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work, 1996 WL 374185 (July 2, 1996))) and, therefore, "further limitation is needed in [Plaintiff's] RFC" (id.). However, the ALJ accorded only partial weight to the FCE, and gave greater weight to later examinations and evaluations. (See Tr. at 31.) Moreover, as detailed above in the discussion of Plaintiff's first assignment of error, the ALJ analyzed multiple pieces of evidence that amounted to substantial evidence to support her determination that Plaintiff remained capable of performing the occasional standing and walking required by sedentary work. (See Tr. at 21, 24-31.)

Plaintiff additionally contends that, because the ALJ afforded great weight to the opinion of Dr. Grant that Plaintiff's "personality traits of 'irritability, anxiety, and quick temper' could cause him to 'have some difficulty interacting appropriately with peers and coworkers,' and 'might make it difficult for him to respond appropriately to supervision'" (Pl.'s Br. at 14 (emphasis added) (quoting Tr. at 662)), "then additional limitations as to workers and supervisors are also needed in [Plaintiff's] RFC" (id. at 14-15). Plaintiff's argument fails, because the ALJ already limited Plaintiff to only occasional interaction with coworkers and supervisors (see Tr. at 23), which amply accommodates Dr. Grant's quite equivocal opinion that "it could be that [Plaintiff] may have some difficulty interacting appropriately with peers and coworkers" and "may also make it difficult for him to respond appropriately to

supervisors" (Tr. at 662 (emphasis added)). Moreover, Plaintiff has not suggested what further limitations on social interaction the ALJ should have included as a result of crediting Dr. Grant's opinion.

In light of the above analysis, Plaintiff has not shown either that the ALJ committed legal error or that the ALJ failed to provide substantial evidence to support the RFC determination.

D.      Medical Opinions

Finally, Plaintiff faults the ALJ for failing to "adequately explain the weight given to medical opinions." (Pl.'s Br. at 15.) More specifically, Plaintiff faults the ALJ for 1) failing to "address or give any weight to Dr. Jewett's opinion that [Plaintiff] suffers from EDS-HT, and the severe symptoms that [Plaintiff] suffers as a result" (id. at 16 (citing Tr. at 31-32, 877-82)); 2) improperly evaluating and weighing the FCE (id. (referencing Tr. at 451-71, 478-92)); 3) failing to "mention what weight or consideration, if any, she assigned the opinions of Dr. Gwynne, Dr. [Fiesky A.] Nunez, [Jr.,] Dr. [Autumn D.] Metzger, [and] Dr. [Benjamin] Haithcock" (id. at 17 (citing Tr. 54, 730, 849, 860)); and 4) providing "conclusory" explanations for the opinions to which the ALJ did assign weight (id. (citing Tr. 31-32)). Those arguments lack merit.

ALJs must evaluate medical opinions in accordance with 20 C.F.R. §§ 404.1527(c) and 416.927(c), better known as the "treating physician rule." This rule generally requires an ALJ to give controlling weight to the well-supported opinion of a treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be

obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(c), 416.927(c). However, if "a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record," it is not entitled to controlling weight. Social Security Ruling 96-2p, Policy Interpretation Ruling Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions, 1996 WL 374188, at *4 (July 2, 1996) ("SSR 96-2p"); [10] 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Craig, 76 F.3d at 590; Mastro, 270 F.3d at 178. Instead, the opinion must be evaluated and weighed using all of the factors provided in 20 C.F.R. §§ 404.1527(c)(2)(i)-(c)(6), 416.927(c)(2)(i)-(c)(6) including (1) the length of the treatment relationship, (2) the frequency of examination, (3) the nature and extent of the treatment relationship, (4) the supportability of the opinion, (5) the consistency of the opinion with the record, (6) whether the source is a specialist, and (7) any other factors that may support or contradict the opinion.

Where an ALJ declines to give controlling weight to a treating source opinion, he must "give good reasons in [his] . . . decision for the weight" assigned, taking the above factors into account. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "This requires the ALJ to provide sufficient explanation for 'meaningful review' by the courts." Thompson v. Colvin, No.

---

[10] The Court notes that for claims filed after March 27, 2017, the regulations have been amended and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. §§ 404.1520c, 416.920c. However, the claim in the present case was filed before March 27, 2017, and the Court has therefore analyzed Plaintiff's claims pursuant to the treating physician rule set out above.

1:09CV278, 2014 WL 185218, at *5 (M.D.N.C. Jan. 15, 2014) (quotations omitted); see also

SSR 96-2p, 1996 WL 374188, at *5 (noting that ALJ's decision "must contain specific reasons

for the weight given to the treating source's medical opinion, supported by the evidence in the

case record, and must be sufficiently specific to make clear to any subsequent reviewers the

weight the [ALJ] gave to the treating source's medical opinion and the reasons for that

weight").

Plaintiff first challenges the ALJ's failure to "address or give any weight to Dr. Jewett's

opinion that [Plaintiff] suffers from EDS-HT, and the severe symptoms that [Plaintiff] suffers

as a result." (Pl.'s Br. at 16 (citing Tr. at 31-32, 877-82).) According to Plaintiff, "Dr. Jewett's

opinion deserves consideration because she performed an extensive exam of [Plaintiff] and

his mother before diagnosing him, and her opinion was accepted by Dr. Keyserling as

consistent with [Plaintiff's] 'medical history and physical exam.'" (Id. (citing Tr. at 877-82,

quoting Tr. at 1102).) However, the ALJ clearly credited Dr. Jewett's diagnosis of EDS, as

the ALJ found that Plaintiff's EDS constituted a severe impairment at step two (see Tr. at 20),

and the ALJ included significant restrictions in Plaintiff's RFC to account for his symptoms

(see Tr. at 23). Notably, Dr. Jewett did not provide any functional limitations arising out of

Plaintiff's EDS but did stress the "importan[ce]" of Plaintiff remaining as "active as his body

will allow in order to maintain his mobility as he ages." (Tr. at 878.) Thus, there was no other

opinion of Dr. Jewett for the ALJ to weigh or address, and Plaintiff's contention is baseless.

With respect to the November 2013 Functional Capacity Examination, Plaintiff faults

the ALJ for failing to "indicate which parts of the [FCE] she gave any weight to, which leaves

this Court to guess at which parts of that evaluation were accepted or not." (Pl.'s Br. at 16

(citing Tr. at 31, referencing Tr. at 451-71, 478-92).) Further, Plaintiff contests the ALJ's

rationale that the FCE was prepared "'four years ago, and does not address [Plaintiff's] current

functioning,'" noting that "the ALJ did not indicate that [Plaintiff's] condition improved

whatsoever during the time between th[e FCE] and the hearing." (Id. at 16-17 (quoting Tr. at

31).) Plaintiff's arguments ultimately do not warrant relief.

> The ALJ weighed the FCE as follows:

> The [ALJ] has considered the recommendations made by Duke Physical
> Therapy and Occupational Therapy following [the FCE], in which they stated
> that [Plaintiff's] mobility, strength, and functioning tolerance were expected to
> improve with home-exercise programs, but have given these recommendations
> only partial weight, as this was prepared almost four years ago, and does not
> address [Plaintiff's] current functioning.

(Tr. at 31 (emphasis added).) The context of the ALJ's reasoning, as emphasized above, makes

clear that the ALJ gave partial weight to the FCE's finding that Plaintiff's "mobility, strength,

and functioning tolerance were expected to improve with home-exercise programs," because

that finding was made "almost four years [earlier], and d[id] not address [Plaintiff's] current

functioning." (Id.) Thus, the Court was not "left to guess" which parts of the FCE the ALJ

partially credited.

Although not expressly argued by Plaintiff, the ALJ did not specifically address the

FCE's findings that that Plaintiff "can't comfortably squat to reach below his knuckle level,"

his "[s]tanding endurance is limited to approximately 17 minutes longest duration, [his]

walking endurance is limited to approximately 10 minutes longest duration," and his "upper

extremity strength and dexterity is below average." (Tr. at 479.) As an initial matter, the

individuals performing the FCE, Melissa Uhl (Occupational Therapy Intern) and Fay J. Tripp

(Occupational Therapist Registered/Licensed), do not constitute "acceptable medical

sources" under the regulations, see 20 C.F.R. §§ 404.1502(a), 416.902(a) (definition of

"acceptable medical source" does not include physical or occupational therapists), and, thus,

their findings do not constitute "medical opinions" as defined by the applicable regulations,

see 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) ("Medical opinions are statements from

acceptable medical sources that reflect judgments about . . . what [a claimant] can still do

despite impairment(s), and [his/her] physical and mental restrictions." (emphasis added)).  On

the other hand:

> Since there is a requirement to consider all relevant evidence in [a claimant's]
> case record, the case record should reflect the consideration of opinions from
> medical sources who are not "acceptable medical sources" . . . who have seen
> the claimant in their professional capacity. Although there is a distinction
> between what an [ALJ] must consider and what the [ALJ] must explain in the
> disability . . . decision, the [ALJ] generally should explain the weight given to
> opinions from these "other sources," or otherwise ensure that the discussion of
> the evidence in the . . . decision allows a claimant or subsequent reviewer to
> follow the [ALJ's] reasoning, when such opinions may have an effect on the
> outcome of the case.

Social Security Ruling 06–03p, Titles II and XVI: Considering Opinions and Other Evidence

from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering

Decisions on Disability by Other Governmental and Nongovernmental Agencies, 2006 WL

2329939, at *6 (Aug. 9, 2006) ("SSR 06–03p") (emphasis added); see also id. at * 3 ("Opinions

from [ ] medical sources, who are not technically deemed 'acceptable medical sources' under

[the Social Security Administration's] rules, are important and should be evaluated on key

issues such as impairment severity and functional effects." (emphasis added), id. at *4

("Although the factors in [20 C.F.R. § 404.1527(c)] and [20 C.F.R. § 416.927(c)] explicitly apply

only to the evaluation of medical opinions from 'acceptable medical sources,' these same

factors can be applied to opinion evidence from 'other sources.'" (emphasis added)).

Here, the ALJ's decision ensures "that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning," SSR 06-03p, 2006 WL 2329939, at *6. As discussed above, the ALJ discussed a litany of evidence, nearly all of which post-dated the FCE, supporting her RFC findings that, in contrast to the FCE's findings, Plaintiff remained capable of performing the standing, walking, and sitting requirements of sedentary work with occasional stooping, crouching, handling, and fingering. (See Tr. at 24-31.) Moreover, the ALJ also relied on the opinion of Dr. Wilson that Plaintiff required only "limitations on significant climbing, walking, or kneeling" (Tr. at 31; see also Tr. at 494) and the opinion of Dr. Edwin that Plaintiff "did not need an assistive device for ambulation, and that his ability to sit, stand, move about, lift, carry, handle objects, . . . and stamina w[ere] not impaired." (Tr. at 31 (emphasis added); see also Tr. at 530.) Under such circumstances, the ALJ's "decision allows [the Court] to follow the [ALJ's] reasoning," SSR 06-03p, 2006 WL 2329939, at *6. See Robshaw v. Colvin, No. 1:14-CV-281-JHR, 2015 WL 3951959, at *5 (D. Me. June 28, 2015).

Next, Plaintiff challenges the ALJ's failure to "mention what weight or consideration, if any, she assigned the opinions of Dr. Gwynne, Dr. Nunez, Dr. Metzger, [and] Dr. Haithcock, which are all relevant to [Plaintiff's] impairments resulting from his EDS-HT diagnosis and other severe impairments." (Id. at 17 (citing Tr. at 54, 730, 849, 860).) However, Plaintiff made no effort to explain which "opinions" from these providers the ALJ should have considered and/or weighed, let alone explained how further consideration and/or weighing of such opinions by the ALJ would have favorably affected Plaintiff's claims. Under such circumstances, the Court need not consider these arguments further. See United States

v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (internal quotation marks omitted)); Hughes v. B/E Aerospace, Inc., No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) (unpublished) (Schroeder, J.) ("A party should not expect a court to do the work that it elected not to do.").[11]

Lastly, Plaintiff contends that the ALJ provided "conclusory" explanations for the opinions to which the ALJ did assign weight. (Id. (citing Tr. at 31-32).) In that regard, Plaintiff notes that "the ALJ stated 'Dr. Grant personally examined [Plaintiff], and her opinion is consistent with her treatment notes,' and [state agency medical consultant] Dr. [Jagjit] Sandhu's opinion 'has been given no weight, as it is not consistent with the record as a whole,' and [state agency medical consultant] Dr. [E. Woods'] opinion 'has been given some weight, although the [ALJ] has assessed mental limitations as well, given [Plaintiff's] anxiety disorder.'" (Id. (citing Tr. at 31-32).) However, the ALJ clearly addressed each of these opinions, and Plaintiff has failed to explain how the ALJ's further consideration of those opinions could have impacted his case and, in particular, the opinions of Drs. Sandhu and Woods, who each found that Plaintiff could perform work at <u>higher</u> exertional levels than the ALJ. (See Tr. at 114, 124 (medium work), 143-44, 162-63 ("essentially sedentary" work, i.e., lifting/carrying at light level and standing/walking/sitting at sedentary level).) Accordingly, Plaintiff has not demonstrated prejudicial error with respect to the ALJ's evaluation of the medical opinion evidence.

---

[11] The Court notes that the transcript pages cited by Plaintiff do not appear to contain any opinions regarding Plaintiff's functional abilities, and instead appear to be examination records that generally reflect Plaintiff and his parents' frustration with the results of the various testing and their frustration with medical providers directing Plaintiff to engage in exercise and physical therapy. (Tr. at 728-30, 847-49, 860-66.)

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Summary Judgment [Doc. #14] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #16] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 30th day of July, 2019.

/s/ Joi Elizabeth Peake
United States Magistrate Judge
